**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LARRY JAMES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-1202 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER of the | § | |
| SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full

pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #2).

Cross-motions for summary judgment have been filed by Pro Se Plaintiff Larry James

("Plaintiff," "James"), and by Defendant Michael J. Astrue, ("Defendant,"

"Commissioner"), in his capacity as Commissioner of the Social Security Administration

("SSA"). (Defendant's Cross-Motion for Summary Judgment, Docket Entry #12;

Defendant's Memorandum in Support of Cross-Motion for Summary Judgment

["Defendant's Motion"], Docket Entry #13; Plaintiff's Motion to Overturn the Defendants

of Not Disable to Disable ["Plaintiff's Motion"], Docket Entry #14). Each party has also

filed a response to the competing motions. (Defendant's Response to Plaintiff's Brief in

Support of Plaintiff's Original Complaint ["Defendant's Response"], Docket Entry #15;

Plaintiff's Response to Defendant's Argument ["Plaintiff's Response"], Docket Entry

#16). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **DENIED**, and that Defendant's motion be **GRANTED**.

**BACKGROUND**

On February 28, 2007, Plaintiff Larry James filed an application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Title II and Title XVI of the Social Security Act ("the Act").[1] (Transcript ["Tr."] 108-114, 123, 135, Docket Entry #10). In his application, Plaintiff claimed that he had been unable to work, since March 31, 2005, because of a "broken collar bone, [and] back injury." (Tr. 135). The SSA denied Plaintiff's application on June 27, 2007, finding that he was not disabled under the Act. (Tr. 51-54). On July 10, 2007, Plaintiff filed a request for a reconsideration of that decision. (Tr. 55). The SSA reopened his case, but again denied him benefits, on August 7, 2007. (Tr. 56-58).

On October 5, 2007, Plaintiff requested a hearing before an administrative law judge (ALJ). (Tr. 8). That hearing, before ALJ Earl W. Crump, took place on September 5, 2008. (Tr. 18). Plaintiff appeared without representation, but he testified on his own behalf. (Id.). The ALJ also heard testimony from a vocational expert witness, Norman Hooge. (Id.). No medical expert witness testified at the hearing. (Id.).

---

[1] Social Security Disability Insurance Benefits are based on the length of time a disabled claimant paid social security pay-roll taxes prior to his disability. 42 U.S.C. § 416. Supplemental Security Income benefits are based on a disabled claimant's financial need. 42 U.S.C. § 1381.

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.   20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173–74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, James has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any

point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that James suffered from "degenerative disc disease, status post fracture of the clavicle, and anxiety." (Tr. 10). Although he determined that James' impairments were severe, the ALJ concluded that he did not "have an impairment or combination of impairments that meets or medically equals one of the listed impairments in" the applicable SSA regulations. (Id.). Further, the ALJ found that, even though James cannot return to his previous work as a construction worker, he has the residual functional capacity ("RFC") to perform other work that is available in the national economy. (Tr. 15). For that reason, the ALJ concluded that James "has not been under a disability, as defined in the Social Security Act, since February 28, 2007, the date the application was filed." (Tr. 16). The ALJ then denied his application for benefits on November 3, 2008. (Id.).

On December 17, 2008, Plaintiff requested an Appeals Council Review of the ALJ's decision. (Tr. 17). The Appeals Council found no reason to amend the ALJ's decision, however, and denied Plaintiff's request on February 23, 2009. (Tr. 1). With that ruling, the ALJ's findings became final, and, on April 21, 2009, James filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Complaint ["Complaint"], Docket Entry #1). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Plaintiff's motion be **DENIED**, and that Defendant's motion be **GRANTED**.

**STANDARD OF REVIEW**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Dr. Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**DISCUSSION**

In his motion, Plaintiff asks the court to reverse the Commissioner's decision to deny his disability benefits, and to render judgment in his favor. (Plaintiff's Motion p.1).

Plaintiff, proceeding pro se, appears to contend that the ALJ did not properly evaluate the evidence, or Plaintiff's credibility, in determining that he was "not disabled," as defined by the Act. (*Id*.). James also asks the court to consider new medical evidence, dated from after the final denial of his claim by the Appeal's Council. (*Id*.). Defendant insists, however, that, because "substantial evidence supports the ALJ's decision, his decision should be affirmed." (Defendant's Motion p. 10).

### *Medical Facts, Opinions, and Diagnoses*

The earliest relevant medical records show that, in March 2005, James fractured his left clavicle and several ribs in a work related accident. (Tr. 13, 199-212). It is reported that, while laying pipe for a plumbing company, a ditch in which James was working collapsed and buried him for almost two hours. (Tr. 214). One month later, on April 26, 2005, James was examined at The Houston Spine & Rehabilitation Center. (Tr. 229-231). On that day, he complained of pain in his left shoulder, neck, upper back, and in his chest. (*Id*.). He complained further of "[p]ain, numbness, and tingling into the left upper extremity." (*Id*.). James reported that the pain was "severe, . . . especially with any kind of movement." (*Id*.). An examination of his cervical spine showed the following:

> . . . severe limitations in range of motion, with severe palpatory tenderness and myospasm in the posterior cervical musculature, extending into the upper trapezius and thoracic paraspinal muscles bilaterally. . . . [C]ompression tests bilaterally are positive for an increase in localized cervical symptoms, as well as the pain that extends into the left upper extremity as well,

(*Id*.). James was diagnosed as suffering from cervical and thoracic radiculitis[2], a possible vertebrae fracture, and confirmed fractures of his ribs and left clavicle. (*Id*.).

On May 9, 2005, James was examined at Sterling Ridge Orthopaedics & Sports Medicine, where he complained of pain in his neck and left shoulder. (Tr.222-223). The results of that examination showed that he had a limited range of motion in his cervical spine, and at the site of his clavicle fracture. (*Id*.).  Under "Assessment," the examining physician, Dr. William M. Hayes, wrote "[l]eft carpal tunnel syndrome, left cervical radiculopathy, rule out C6 fracture, left clavicle fracture, left second and third rib fracture." (*Id*.). Dr. Hayes ordered another MRI, he recommended that James undergo a psychological consult, and he prescribed unspecified pain medications. (*Id*.).

On June 6, 2005, James was seen for a follow-up examination, and an MRI of his cervical spine "showed no evidence of fracture." (Tr. 221, 225-226). On that day, Dr. Hayes found "subtle posterior disc bulges at C6-C7," but that there was "no significant central stenosis or impingement of the exiting nerve roots." Dr. Hayes deemed these findings "reassuring from a medical standpoint." (*Id*.). However, Dr. Hayes included the following statement in his notes:

> I am very concerned about his posttraumatic stress. I called Dr. Bricken today and I think the patient needs to be seen by him for a psychological assessment and maybe a psychiatric consultation. The patient has worrisome findings for post traumatic stress. I will let the experts deal with this. From our standpoint, his clavicle has improved. It is still somewhat tender, but the false motion has resolved. I will follow him in one month. He is to do no work at this stage from my standpoint.

(*Id*.).

---

[2] "Radiculitis" is "an inflammation involving a spinal nerve root, resulting in pain and hyperesthesia." MOSBY'S MEDICAL, NURSING, & ALLIED HEATH DICTIONARY 1377 (5th ed. 1998).

On June 23, 2005, James began treatment with Dr. Jose Reyes, Jr., for pain management. (Tr. 281). Dr. Reyes reported that James "continues with the radicular pain down both upper extremities, numbness and tingling of the hands and low back pain, lumbar radiculopathy." (*Id*.). Dr. Reyes recommended "cervical epidural steroid injection to try to alleviate some of his pain in the cervical spine." (*Id*.).

On July 14, 2005, Dr. Glenn J. Bricken performed a psychological evaluation. (Tr. 214-216). On that day, James described his pain as an "eight" on a scale of "one" to "ten." (*Id*.). He claimed that he suffered from "anxiety, feeling exhausted, difficulty sleeping (sleeps approximately 2 hours a night), anger, a loss of concentration, a loss of sex drive, a loss of enjoyment, a loss of self confidence, a loss of self esteem and frustration related to his persistent fear and symptoms of trauma." (*Id*.). James also reported suffering from "severe panic attacks approximately 4 times per week," during which he felt "jumpy and nervous," and experienced "intrusive thoughts concerning his accident, a sense of hyper vigilance, sensitivity to noise, a heightened startle reflex, racing thoughts (constantly thinking about the injury), shortness of breath, tightness in his chest, stomach knots, feeling shaky, profuse sweating, and feeling dizzy and lightheaded." (*Id*.).

Upon examination, James was "alert and oriented," and he "denied any suicidal or homicidal ideation." (*Id*.). Dr. Bricken reported that James did "not appear to exhibit any cognitive deficits," but stated that Plaintiff's "pain and anxiety have caused memory and concentration difficulties." (*Id*.). Dr. Bricken summarized his "Impressions" as follows:

> With appropriate medical and psychological intervention, Mr. James is likely to make additional recovery, learn to work around his injury and return to gainful employment. Without these supports, the patient is likely to continue exhibiting severe anxiety, become increasingly depressed, is at

risk of becoming dependent on Opioid medication and will most likely remain more disabled than necessary.

(*Id*.). Following his examination, Dr. Bricken ascribed a Global Assessment of Functioning ("GAF") score of 45 to James.[3] (*Id*.). He then recommended a variety of treatments, including individual psychotherapy, cognitive therapy, and medication. (*Id*.). Dr. Bricken concluded that, as James' "psychological concerns are addressed, it is likely that his physiological reactivity and experience of physical pain will also be reduced." (*Id*.).

On July 19, 2005, James was seen by Dr. Hayes, who reported that Plaintiff "still has lumbar pain and still has signs and symptoms of post traumatic stress." (Tr. 219-220). Two days later, James had a follow up examination with Dr. Reyes. On that day, Dr. Reyes reported that Plaintiff "continues to have pain in his left upper extremity and his lower back and legs." (Tr. 280). Following an examination in August 2005, Dr. Reyes recommended surgery to treat James' pain, after the insurance company refused to pay for steroid injections. (Tr. 279). At an examination one month later, Dr. Reyes reported that James "has pain across his lower back and legs. The pain seems to be getting worse. Also, the pain in his neck seems to be getting worse." (Tr. 278).

On October 4, 2005, James returned to The Houston Spine & Rehabilitation Center for an examination. (Tr. 255). The examiner, Dr. Mark C. Yezak, reported that:

> . . . there is an obvious location of a callus and a clavicle injury. His range of motion is normal. There is pain with endpoint ranges of motion. There is tenderness in the lumbar spine, at L4-L5. . . . Normal range of motion. There is pain at endpoint motion of lumbar flexion and extension.

---

[3] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). A GAF of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job)." *Id.*

(*Id*.). Dr. Yezak determined that James suffered from "nonunion of the left clavicle," and "lumbar sprain/strain." (*Id*.). He also wrote a letter, addressed to "Whom It May Concern," in which he stated that:

> Due to the combination of the ongoing medical treatment, the ongoing disability, and the [possibility of side-effects from his pain] medications, I do not feel that it is practical for this patient, at this time, to be considered a vocational candidate; therefore he has not been able to work . . . .

(Tr. 256).

On January 5, 2006, Dr. Reyes examined James, and reported that he "has a herniated disc in the cervical spine with radiculopathy. He is having some decreased grip strength on the left." (Tr. 277). After a follow up examination three months later, Dr Reyes found that James "continues to have pain to the posterior neck, posterior shoulders." (Tr. 274). Follow up examinations in June, July, September, and October 2006, all revealed that James' physical condition was "basically the same." (Tr. 269-272). On January 15, 2007, Dr. Reyes reported that James "is still having pain in his lower back. The pain seems to be getting worse. The pain medication is helping in controlling his pain." (Tr. 268). Likewise, on February 12, 2007, Dr. Reyes found that James "continues with pain in the posterior neck, posterior shoulder, lower back and legs," but that the "pain medication is helping in controlling his pain." (Tr. 267). Finally, on April 26, 2007, Dr. Reyes reported that Plaintiff was "basically the same," and that he "continues to have pain across his lower back and legs. Overall, the pain medications are helping him in controlling his pain." (Tr. 338).

On May 29, 2007, Dr. Ryan Holmes, at Holmes Internal Medicine, P.A., examined

James and summarized his condition as follows:

> Patient with multiple orthopaedic complaints, primarily lumbar spine, cervical spine, and left clavicular/shoulder pain. Mild disruption of motor function. Neurologic examination normal. Deformity to left clavicle likely related to prior fx. Suspect component of PTSD present, but would defer to psychiatry.

(*Id*.). (Tr. 298-300). Dr. Homes found "mild limits" in the range of motion of James' cervical and lumbar spine. (*Id*.). James demonstrated a limp, and "difficulty in ability to move about, lift and carry and unable to walk heel-to-toe and tandem walk without difficulty." (*Id*.). Dr. Holmes reported that James was oriented, and that his "mood and affect [were] appropriate to situation, but visibly anxious." (*Id*.).

On June 4, 2007, James was examined by Mark Lehman, Ph.D., a psychologist with Marathon Psychology Group, on behalf of the state. (Tr. 304-309). James listed his chief complaints as depression, anxiety, and post traumatic stress syndrome. (*Id*.). He reported that he suffered from daily flashbacks to his accident, and panic attacks, usually at night. (*Id*.). James told Dr. Lehman that, "[p]eriodically, he sees a dark figure standing over his bed." (*Id*.). James stated that, since his accident, he had become claustrophobic, that "he feels bored all the time," that he "has lost interest in previously enjoyable activities," and that he "feels sad, frustrated and . . . socially withdrawn." (*Id*.). However, James reported "no history of suicidal thoughts, self-injury, delusions or auditory hallucinations." (*Id*.). Plaintiff stated that he was "able to bathe and dress himself without assistance," that he "prepares toast, sandwiches and other quick, simple meals," but that his mother "cooks most of his meals," and does the household chores. (*Id*.). James told Dr.

Lehman that he is "capable of purchasing basic items at the store and can manage his own funds," but that "his mother does the grocery shopping," and that he "has stopped operating motor vehicles." (*Id*.). James stated that he "spends his days at home watching television and playing video games." (*Id*.). Finally, he reported that his "social network includes his immediate family and a few close friends who visit him on occasion." (*Id*.). Dr. Lehman concluded that James' "ability to complete tasks timely and appropriately is likely compromised somewhat by his alleged disability." (*Id*.). He also found, however, that James "was clean and adequately groomed with no problems noted in personal hygiene," that his "gait and fine motor dexterity seemed normal," and that his "speech was clearly articulated, coherent, and relevant with no evidence of stuttering, stammering, or related difficulties." (*Id*.). James' "thought processes were normal." (*Id*.). James was not confused, and he was grossly oriented to person, place and time. (*Id*.). Plaintiff's memory was intact for immediate, recent, and remote events, and he could recall three unrelated items immediately, and two of the same three items following a five-minute delay. (*Id*.). James identified the current President of the United States, the previous President, and the Governor of Texas, and he correctly identified four quarters, ten dimes and twenty nickels in one dollar. (*Id*.).  He was able to spell his last name backward, and was able to count backward from twenty to one. (*Id*.). Dr. Lehman concluded that James' "[j]udgment and insight appeared fair," and he determined his GAF score to be a 55.[4] (*Id*.). Finally, Dr. Lehman determined that "Mr. James' Post Traumatic Stress Disorder is stable and may improve over time with continued psychiatric treatment." (*Id*.).

---

[4] A GAF of 51-60 indicates moderate symptoms, such as occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as conflicts with peers or co-workers. DSM-IV 34.

On June 20, 2007, Nancy Wilson, Ph.D, a state examiner, completed a Psychiatric Review Technique form concerning Plaintiff. (Tr. 310-323). She listed post traumatic stress syndrome as his primary complaint. (*Id.*). Dr. Wilson found that James had moderate "restrictions of daily living"; mild "difficulties in maintaining social functioning"; and mild "difficulties in maintaining concentration, persistence or pace." (*Id.*). She found no "episodes of decompensation." (*Id.*). Dr. Wilson concluded as follows:

> Claimant's allegation of PTSD is supported by the [objective medical evidence]. His allegation of the severity of his symptoms is not fully supported. Specifically, his reports of his leisure activities (playing cards and video games) imply that his ability to concentrate is at least fair. His memory tests well.

(*Id.*).

Dr. Wilson also completed a Mental Residual Functional Capacity Assessment. (Tr. 324-327). She deemed James to be "moderately limited" in five areas: "the ability to understand and remember detailed instructions"; "the ability to carry out detailed instructions"; "the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "the ability to travel in unfamiliar places or use public transportation"; and "the ability to set realistic goals or make plans independently of others." (*Id.*). Dr. Wilson concluded as follows;

> Claimant can understand, remember and carry out detailed, but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work setting.

(*Id.*). For that reason, she found that James' "[a]lleged limitations [are] not fully supported by" the objective medical evidence. (*Id.*).

On June 21, 2007, Dr. James Wright completed a Physical Residual Functional Capacity Assessment of James, based on his medical history. (Tr. 328-335). Dr. Wright found that James could lift or carry 20 pound items occasionally; he could frequently lift or carry 10 pound items; he could stand or walk for 6 hours in an 8 hour day; he could sit for 6 hours in an 8 hour day; and he had an unlimited ability to push or pull. (*Id.*). Dr. Wright reported that James could frequently climb ramps or stairs, balance, and kneel, but that he could only occasionally stoop, crouch, or crawl. (*Id.*). He found that James could never climb ladders, ropes, or scaffolds. (*Id.*). He further found that James had no manipulative, visual, communicative, environmental limitations. (*Id.*). Dr. Wright concluded as follows:

> Claimant's allegations of injuries to neck, low back and clavicle are supported by the [objective medical evidence]. The objective evidence does not support the claimant's alleged severity of his limitations caused by these injuries.

(*Id.*).

On July 12, 2007, James returned to Dr. Reyes for a follow up examination. (Tr. 339). Dr. Reyes summarized his findings as follows:

> He continues to have pain across his lower back and legs, posterior neck and shoulders. The pain medication is helping in bringing his pain down from about a 8 to a 3 or 4 on the analog pain scale from 1 to 10. Today he is hurting a little more, and he said that he did some work around his garden and the pain increased.

(*Id.*). Two months later, Dr. Reyes reported that James:

> . . . continues to have pain across his lower back and legs and posterior neck and posterior shoulders, especially the left. He has numbness and tingling in his feet and hands. His current pain medications provide him with some relief, but not enough and the pain seems to be getting worse.

(Tr. 351). James' "[d]eep tendon reflexes [were] slightly decreased on the left when compared to the right in the lower extremities." (*Id*.). Dr. Reyes found that Plaintiff had pain in his upper extremities, the posterior neck, posterior shoulders, and lower back. (*Id*.). He also noted "decreased grip strength on the left when compared to the right," and "decreased range of motion of the left shoulder." (*Id*.). On November 21, 2007, Dr. Reyes reported that James "continues to have pain across the posterior neck, posterior shoulder, lower back and legs," that "his pain is about a 7 on the analog pain scale from 1 to 10," but that "[w]ith the medication it goes down to about a 2." (Tr. 350). Follow up examinations in January and March 2008, showed that James' condition was "basically the same." (Tr. 348-349).

On May 7, 2008, Dr. Reyes found that James "continues to have pain across his lower back, lower legs . . .  the posterior neck, posterior shoulders, upper extremities and weakness of the left hand." (Tr. 347).  He noted that James showed "decreased grip strength on the left when compared to the right," but his "[d]eep tendon reflexes are within normal limits in the upper extremities." (*Id*.). Three months later, James reported to Dr. Reyes that his "pain medication is helping in controlling his pain, bringing his pain down from about an 8 to about a 4 on the analog pain scale from 1 to 10." (Tr. 346). Finally, in response to disability inquiries, Dr. Reyes reported, in August and December 2008, that James' "disability is not permanent [but] is expected to last more than 6 months." (Tr. 365).

***Educational Background, Work History, and Present Age***

At the time of the administrative hearing, James was 44 years old. (Tr. 15). He had received a GED, and had prior work experience as a construction worker and a plumber. (Tr. 15, 305).

***Subjective Complaints***

At the hearing before the ALJ, on September 5, 2008, James testified that his last employment, laying pipe for a plumbing company, required him to lift items weighing up to 200 pounds. (Tr. 27). James told the ALJ that he no longer drives a car, and did not have a driver's license. (Tr. 28). Asked to describe a "normal" day, James testified that, on a "normal" day, he wakes up at 9 a.m., and then watches TV, or plays cards with a friend. (Tr. 29). He testified that he needs no help in "dressing or bathing, or with other personal need[s]," and that he prepared meals in the microwave. (*Id.*). James testified, however, that he did no housework, or shopping, nor did he attend any churches, clubs, or other social events. (Tr. 30). He testified that he typically goes to bed at 10 p.m., but that he had sleep problems. (Id.). He further testified that,

> . . . I have panic attacks. I've, I've went to the emergency room in the middle of the night, thinking I'm having a heart attack. I, I'm on Xanax that, that helps my panic attacks. And sometimes I, when I wake up, my heart'll be beating real fast, and I'll have to take a Xanax and lay there for a couple of hours before I'm able to go back to sleep.

(*Id.*). James told the ALJ that, without medication, he suffers panic attacks every day, and that, even with medication, he suffers three or four attacks a week. (Tr. 31). The ALJ asked James whether he had any other mental problems, to which Plaintiff responded as follows:

> A.      . . . I've got post traumatic stress. I'm very depressed. I, just a lot of anxiety. Just, like right now I feel sick at my stomach.

17

(Tr. 30-31). James testified that Dr. Reyes had prescribed Xanax to control his PTSD, Norco for his pain, and Soma as a muscle relaxer. (Tr. 32-33). But James testified that he suffered nausea as a side effect from those medications. (*Id*.). The ALJ asked whether Plaintiff required any orthopedic or assistive device, such as a "back brace or cervical collar," and James responded that he did not, but he would occasionally use a sling for his left arm. (*Id*.). The ALJ then asked Plaintiff if he did "anything for exercise or therapy." (*Id*.). James responded "No, I don't. I, I should, but I don't." (Tr. 34). James testified that he could walk for 300 to 400 feet at one time, and could stand for thirty minutes at a time, before experiencing back pain. (*Id*.). The ALJ then asked about his ability to sit and stand during a workday:

> Q.     In an eight hour period, like a normal workday, if you could alternate sitting and standing as needed and take short breaks every couple of hours, how long could you be on your feet altogether out of those eight hours?
>
> A.     Five. That's just a guess. . . .

(*Id*.). James testified that he could sit for 30 minutes at one time, but that he had trouble going up and down steps, bending, and stooping. (*Id*.). He also stated that he could reach overhead with his left arm, but that it is painful to do so. (*Id*.). Plaintiff reported difficulty in gripping and manipulating objects with his left hand, but not with his right hand. (Tr. 35). He testified that he could lift or carry ten pound items regularly. (*Id*.). James also testified that he had trouble with memory and concentration, but had no trouble interacting with other people. (*Id*.). James did tell the ALJ, however, that he had difficulty responding

to stress or pressure, because stress can trigger panic attacks. (Tr. 36). Finally, James

testified that he was unable to work, "mostly" because of his pain. (*Id*.).

### *Expert Testimony*

The ALJ next heard testimony from Norman Hooge ("Mr. Hooge"), a vocational

expert. (Tr. 37). The ALJ first instructed Mr. Hooge to consider "someone of Mr. James'

age, education, and vocational background." (*Id*.). He then asked Mr. Hooge a series of

hypothetical questions, including the following:

> Q. For purposes of the first hypothetical question, please assume an
> individual limited exertionally to the performance of no more than
> light work, as defined by the Department of Labor, and reflected in
> the Social Security Administration's regulations. Assume further
> that this person would be limited to no more than occasional
> stooping, crouching, or crawling, and would be precluded from
> performing highly-detailed work, or work requiring sustained
> persistence and pace for prolonged periods. As you've analyzed the
> claimant's past relevant work, these limitations would apparently
> preclude the performance of any of that, is that basically correct?
>
> A. Yes, Your Honor, that'd be correct.

(Tr. 39-40). The ALJ then asked whether someone with those limitations, given James'

age, education, and vocational background, could perform "other work in the national or

local economies." (*Id*.). Mr. Hooge responded that such a person could work as an

electronic or small products assembler, as an office helper, or as a deli cutter-slicer. (*Id*.).

He further testified that 35,000 assembly jobs existed locally, and a similar number were

available nationally, and that there were 20,000 office helper positions locally, and 25,000

available nationally. (*Id*.). Finally, Mr. Hooge testified that there were 3,500 deli jobs

available locally, and another 100,000 of them available nationally. (*Id*.). The ALJ then

asked whether those same jobs are available to a hypothetical worker who was limited to

"no more than occasional reaching overhead with the left upper extremity." (Tr. 40). Mr. Hooge testified that the listed jobs would still be available to such an individual. (*Id*.).

Mr. Hooge was then asked to assume an individual who was "limited exertionally to . . . no more than sedentary work," who "would be limited to no more than occasional stooping, crouching, or crawling." (*Id*.). The individual would also be limited to "only occasional reaching overhead with the left upper extremity," and "would be precluded from performing highly-detailed work or work requiring sustained persistence and pace for prolonged periods of time." (*Id*.). Mr. Hooge responded that an individual with those limitations could perform sedentary assembly work, and that 8,000 of those positions existed locally, and 125,000 such jobs were available nationally. (*Id*.).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. (Tr. 5-16). From his review of the record, he determined that James suffered from "degenerative disc disease, status post fracture of the clavicle, and anxiety," and he found that those conditions were "severe." (Tr. 10).  The ALJ found further that James was unable to return to his former work as a construction worker or a plumber. (Tr. 14-15). Ultimately, however, he concluded that James is capable of performing a limited range of light jobs that exist in significant numbers in the regional and national economies, including work as an assembler, an office helper, or a delicatessen "cutter/slicer." (Tr. 15-16). For that reason, the ALJ determined that James was "not disabled" under the Act, and he denied Plaintiff's application for benefits. (Tr. 16). That denial prompted James' request for judicial review.

From the pleadings, it appears that James challenges the ALJ's decision for three reasons: he claims that the decision is not supported by substantial evidence; he claims that the ALJ did not properly assess his credibility; and he claims that there is new medical evidence available which supports a disability finding in his case. (*See* Plaintiff's Motion). It is well settled, however, that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Dr. Brown*, 192 F.3d at 496). Further, a finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

*Substantial Evidence*

In his decision, the ALJ found that James "has the residual functional capacity to perform light work,"[5] and that he has the ability to "lift up to 20 pounds occasionally and 10 pounds frequently and to stand/walk and sit for 6 hours of an 8-hour workday." (Tr. 12). He also determined, however, that James can only "occasionally stoop, crouch, or crawl and only occasionally reach overhead with the left upper extremity." (*Id*.). Finally, the ALJ concluded that James "can do no highly detailed work and none requiring sustained

---

[5] Under SSA regulations, "light work" involves the following:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. 416.967(b).

concentration, persistence, or pace for prolonged periods of time." (*Id.*). Based on those findings, the ALJ determined that James could perform work that existed in the national economy, and so, was "not disabled" under the Act. (Tr. 15). For that reason, the ALJ denied James' application for disability benefits. (*Id.*).

"If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *See Newton*, 209 F.3d at 452 (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).

Here, the objective medical evidence shows that, two months after James' injury, Dr. Hayes reported that an MRI of his cervical spine "showed no evidence of fracture," and "no significant central stenosis or impingement of the exiting nerve roots." (Tr. 221, 225-226). In October 2005, Dr. Yezak reported that James had a normal range of motion in his clavicle and his lumbar spine. (Tr. 255). Dr. Reyes reported, in January, February, and April 2007, that James' pain was controlled by medication. (Tr. 268). In May 2007, Dr. Holmes reported that James had only mild "disruption of motor function," and a mild limitation in his range of motion. (Tr. 298-300). During a psychological examination in June 2007, Dr. Lehman reported that James' "gait and fine motor dexterity seemed normal." (Tr. 304-309). Finally, from July 2007 to July 2008, James consistently told Dr. Reyes that the prescribed pain medication reduced his pain from an "eight" or "nine" to a "two" or "four" on a scale of one to ten. (Tr. 339, 346, 351, 350). Further, at the

administrative hearing, James testified that he could lift 10 pounds regularly, that he could stand for as long as five hours in an eight hour workday, and that he could sit or stand for 30 minutes at a time. (Tr. 34-36). On this record, there is substantial evidence to support the ALJ's determination of James' physical RFC. *See Myers*, 238 F.3d at 619.

Likewise, the ALJ's determination of James' mental RFC is supported by substantial evidence. For example, the objective medical evidence shows that, in July 2005, Dr. Bricken found that Plaintiff did "not appear to exhibit any cognitive defects," and that, "[w]ith appropriate medical and psychological intervention, Mr. James is likely to make additional recovery, learn to work around his injury and return to gainful employment." (Tr. 214-216). Indeed, Dr. Lehman ascribed a GAF score of 55 to James two years later. (Tr. 304-309). In June 2007, Dr. Lehman also found that James' "thought processes were normal," that his memory functions were intact, and that his "[j]udgment and insight appeared fair." (*Id.*). Based on the objective medical evidence, the ALJ concluded that James "can do no highly detailed work and none requiring sustained concentration, persistence, or pace for prolonged periods of time." (*Id.*). Because the ALJ's RFC is supported by substantial evidence, and Plaintiff has identified no medical evidence to support a finding of more severe physical or mental limitations than those already accounted for in the ALJ's RFC, it should be affirmed. *See Newton*, 209 F.3d at 452.

*Credibility Findings*

In his pleadings, Plaintiff alleges that the ALJ failed to assess his credibility properly. (Plaintiff's Motion p.2)("Judge Earl W. Crump in his own words says he thought I was exaggerating, that was his opinion and 'not the facts.'"). It is easy to see that, in his

23

decision, the ALJ considered Plaintiff's credibility in conjunction with an evaluation of James' residual functional capacity. (Tr. 14). The ALJ found that, "[a]lthough [James] described [his] inability to work, . . . he is able to play cards, play video games, watch television, and cook using a microwave oven." (*Id*.). James also "testified to extreme, debilitating pain, yet recent reports stated that his pain was rated at 3/10." (*Id*.). The ALJ noted that, while James complained of lower back pains, "no x-rays or other studies . . . have identified abnormalities of the lumbar spine." (*Id*.). And, although James told Dr. Lehman that he "[p]eriodically . . . sees a dark figure standing over his bed," the ALJ correctly noted that Plaintiff never reported hallucinations anywhere else in the medical records or at the administrative hearing. (*Id*.). (Tr. 304-309). In light of those inconsistencies, the ALJ determined that James' subjective complaints were "exaggerated in light of the objective evidence." (*Id*.).

To determine a claimant's residual functional capacity, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). If the ALJ rejects a claimant's subjective complaints, the reasons for so doing must be made clear. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For example, he may find that the claimant's subjective complaints were "exaggerated and not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id*. These credibility determinations "are precisely the kinds of determinations that the ALJ is best positioned to make." *Id*. As such, they are "entitled to considerable judicial deference." *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

In this instance, the ALJ found that James' subjective complaints were "exaggerated in light of the objective evidence." That conclusion was bolstered by inconsistencies in Plaintiff's own testimony. For example, James claimed to suffer from debilitating pain, yet he testified that he was able to play cards and video games, and reported that, with medication, his pain rated only a two or three on a scale of one to ten. Moreover, James testified that he needs no help in "dressing or bathing, or with other personal need[s]." (Tr. 29). Finally, Plaintiff testified that he could lift 10 pound items regularly, and could stand or walk for five hours out of an eight hour workday. (Tr. 35). The ALJ had a duty to evaluate the credibility of James' subjective complaints, and to state his reasons for discrediting them. *Falco*, 27 F.3d at 164. It is clear from his written decision that the ALJ rejected Plaintiff's subjective complaints of disabling pain because they were belied by his own testimony. Because "the ALJ is best positioned to make" such credibility determinations, and his determination is supported by substantial evidence, the ALJ's decision should be affirmed. *See Falco*, 27 F.3d at 164; *Haywood*, 888 F.2d at 1470; *Wingo*, 852 F.2d at 830.

*New Medical Evidence*

Finally, in his motion, James asks the court to consider a physical RFC questionnaire and a mental RFC questionnaire, both completed in December 2009, by Plaintiff's current physician, Dr. Clint Cheng. Defendant argues that this new evidence should not be considered, because it was not made available to either the ALJ or to the Appeals Council. It is true that the court may not consider additional evidence as part of its substantial evidence review. 42 U.S.C. § 405(g). It may, however, remand the case to the

Commissioner for further proceedings, if appropriate. *Id*. Such remand is proper if the evidence is new, material, and good cause exists for the claimant's failure to present the evidence at the administrative level. *Id*. Defendant is correct, however, that, to be considered material, the new evidence must relate to the period on or before the ALJ's decision. *Falco*, 27 F.3d at 164. The Fifth Circuit has held repeatedly that "it is implicit in the materiality requirement that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Id*.; *Haywood*, 888 F.2d at 1471; *Bradley*, 809 F.2d at 1058; *Johnson*, 767 F.2d at 183; *see also Leggett*, 67 F.3d at 567. A medical assessment is not material if it reports only on the claimant's recent health and current functional status. *Haywood*, 888 F.2d at 1472.  It must address his condition either at the time of his disability application, or at the time of his hearing. *Id*.  In this instance, the ALJ denied James' application for benefits on November 3, 2008. The new evidence that James asks the court to consider is dated approximately one year later. It is clear, then, that the evidence does not relate to the time before the ALJ's decision, and so, it is immaterial, and the court need not remand the case for further proceedings on that basis. *See Falco*, 27 F.3d at 164 (evidence of a "subsequent deterioration of the previously non-disabling condition" is immaterial).

*Duty to Develop the Record*

Finally, because James did not have legal representation at the administrative hearing, the ALJ had a heightened responsibility to develop the medical record on Plaintiff's impairments. As a general rule, in determining whether a disability exists, an

ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane*, 731 F.2d at 1219). When a claimant is unrepresented, the ALJ's "basic obligation" rises to a "special duty" to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Kane*, 731 F.2d at1219-1220. If he fails to do so, his decision is not supported by substantial evidence, and it is subject to reversal if the error results in prejudice to the claimant. *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. However, the claimant "must show that, had the ALJ done his duty, he could and would have adduced evidence that might have altered the result." *Kane*, 731 F.2d at 1220. Here, in determining that James was not disabled under the Act, the ALJ considered three years of medical reports documenting Plaintiff's mental and physical impairments. James does not argue, and the record does not suggest, that the ALJ failed to discover additional medical "evidence that might have altered the result." *Id*. On this record then, the ALJ did not fail to adequately develop the record.

**CONCLUSION**

In sum, the ALJ's decision to deny disability benefits to James was supported by substantial evidence, and was rendered in accordance with the law governing his claim. Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion be **DENIED,** and that Defendant's motion be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c). Failure to file written objections within the time

period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 3rd day of August, 2010.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**